J-A26039-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF: J.R.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.L.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 594 WDA 2025 |

Appeal from the Order Entered April 15, 2025
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
11 in Adoption 2025

BEFORE: OLSON, J., STABILE, J., and KING, J.

MEMORANDUM BY KING, J.: **FILED: December 10, 2025**

Appellant, T.L.B. ("Mother"), appeals from the order entered in the Erie County Court of Common Pleas, Orphans' Court, which granted the petition filed by the Erie County Office of Children and Youth ("OCY") for involuntary termination of Mother's parental rights to J.R.S. ("Child"). We affirm.

The relevant facts and procedural history of this case are as follows. On October 8, 2024, shortly after Child's birth, Child was removed from Mother's custody and placed in kinship care with Child's maternal aunt, T.B. ("Maternal Aunt"). On October 14, 2024, OCY filed a dependency petition, alleging that Child was without proper parental care or control. Specifically, the petition alleged that Mother tested positive for methamphetamine, cocaine and marijuana while she was pregnant with Child. The petition further stated that OCY has been involved with Mother since 2010 and Mother has been unable to maintain her sobriety or follow treatment plans throughout that time. As a

result, three of Mother's other children were no longer in her care. Mother also has a history of mental health issues and unstable housing. OCY further indicated concerns regarding a history of domestic abuse between Mother and Child's father,[1] S.M.S. ("Father"), who was incarcerated at the time of Child's birth. In July of 2024, Father was violent towards Mother, resulting in police intervention and Father's arrest. On October 22, 2024, the Orphans' Court adjudicated Child dependent with the goal of reunification. The court further determined that Child should remain in kinship placement with Maternal Aunt. At the hearing, Mother stipulated to the allegations set forth in the dependency petition.

Mother also agreed as part of her treatment plan to: obtain and maintain safe and stable housing; participate in an approved parenting program; attend medical appointments and follow all recommendations; cooperate and communicate with OCY workers; demonstrate the ability to provide for Child's needs through employment or other resources; participate in mental health services and follow all recommendations; refrain from the use of drugs and alcohol and submit to random urinalysis testing; participate in drug and alcohol assessment and follow all recommendations; and participate in an anger management class.

On January 27, 2025, the court conducted a permanency review hearing. Mother did not attend the hearing. OCY petitioned the court to

---

[1] At the time, S.M.S. was identified as Child's putative father. Subsequently, genetic testing confirmed that S.M.S. is Child's father.

change the goal from reunification to adoption. In support of its request, OCY reported that Mother left the shelter where she was residing without checking out on November 19, 2024, and stopped attending services, visits with Child, and urinalysis testing since then. At the conclusion of the hearing, the court changed the goal to adoption. On February 5, 2025, OCY petitioned the court to involuntarily terminate Mother's parental rights to Child.

The court conducted a termination hearing on April 10, 2025. At the beginning of the hearing, Child's attorney requested the court to find that Child's legal and best interests are merged because Child was only six months old and unable to articulate a legal position. The court agreed and found that Child's legal and best interests were aligned.

Katelyn Szewczyk, an OCY caseworker, testified that Child was removed from Mother's care due to concerns about Mother's sobriety, mental health, housing, and relationship with Father. OCY has been involved with Mother since 2010 in relation to three of her other children. Mother had a very similar treatment plan as the plan imposed in this matter in the proceedings involving her three other children. Mother was unable to comply with the treatment plan during the proceedings for her two older children. Consequently, Mother's relatives have permanent legal guardianship over her two older children. Mother successfully completed her court ordered treatments in the proceeding involving one child, R.A.B., and R.A.B. was returned to Mother's care. However, on June 12, 2024, approximately six weeks after R.A.B. was returned to Mother's care, Mother relapsed and R.A.B. was removed from

Mother's care again. Mother was pregnant with Child at this time. Mother's parental rights to R.A.B. were involuntarily terminated on February 26, 2025.

Ms. Szewczyk testified that Mother exhibited a consistent pattern over the years of maintaining treatment and sobriety for a short period of time but repeatedly relapsing. Mother had previously participated in four drug and alcohol rehabilitation programs. Mother also participated in dependency drug and alcohol treatment court but was unsuccessfully discharged. Regardless of the services provided, Mother has been unable to maintain her sobriety.

Ms. Szewczyk stated that Mother exhibited the same pattern in this case. After the adjudication hearing on October 22, 2024, Mother was initially very motivated to work on the treatment plan. Mother was staying at a shelter called The Refuge and was seeking a longer-term residence through the Erie Housing Authority. Mother participated in three visits with Child, and she did well during these visits. Mother also underwent urinalysis testing and tested negative for nine random tests between October 28, 2024 and November 13, 2024. Mother also kept in contact with Ms. Szewczyk and the interactions were positive.

Nevertheless, on November 19, 2024, Ms. Szewczyk learned that Mother had left The Refuge without signing out. Ms. Szewczyk attempted to contact Mother at that point but was unsuccessful. Mother called Ms. Szewczyk back on November 22, 2024 and was very emotional on the phone. She stated that she was not doing well and wanted to check into a rehabilitation center. Mother further stated that wanted to terminate her

rights to Child. However, Mother denied that she had relapsed, which was also a consistent pattern Mother exhibited throughout the years. Ms. Szewczyk told Mother to take some time to think about whether she wanted to terminate her parental rights to Child. She further told Mother to contact her caseworker at Plan of Safe Care to find a rehabilitation center.

After Mother left The Refuge, she failed to appear for 28 urinalysis tests. Mother also failed to appear for her scheduled visits with Child and meetings with providers. Mother further did not attend any of Child's medical appointments. Mother lost her opportunity to obtain housing through the Erie Housing Authority and has not established any other form of stable housing. Mother also has not obtained stable employment or other means of income. Additionally, Mother has not engaged in any mental health or drug and alcohol treatment since she left The Refuge. Ms. Szewczyk further testified that Mother and Father have a co-dependent relationship with each other and concerns about domestic abuse persist.

Mother contacted Ms. Szewczyk approximately three times between the time she left The Refuge and the January 27, 2025 permanency review hearing. During these calls, Ms. Szewczyk discussed Mother's non-compliance with the treatment plan and repeatedly sent Mother the contact information for her providers. Ms. Szewczyk also informed Mother that OCY would be seeking to change the goal to adoption at the permanency review hearing due to Mother's non-compliance. Mother told Ms. Szewczyk that she was non-compliant because she was not doing well but continued to state that she had

not relapsed.

Ms. Szewczyk testified that Child is doing well in Maternal Aunt's care. Maternal Aunt provides for all of Child's needs and is loving and attentive towards him. Child's siblings are also in the same residence. Ms. Szewczyk opined that due to Mother's failure to make any progress on her treatment plan and inability to provide a safe and stable environment for Child, it would be in Child's best interest to remain in Maternal Aunt's care. She further stated that Mother has only visited Child on three occasions, all before November 19, 2024. As such, she did not believe that there would be a negative effect on Child if the court involuntarily terminated Mother's parental rights.

Michael Vicander, an OCY permanency caseworker, testified that he has observed Maternal Aunt's interactions with Child. Maternal Aunt has a very natural mother-child relationship with Child. Mr. Vicander has no concerns about Maternal Aunt's care of Child, and she meets all of Child's physical, mental, and emotional needs. Child is well bonded with Maternal Aunt. He opined that Child would not suffer negative effects if Mother's parental rights were involuntarily terminated.

Mother testified that she left The Refuge because she was overwhelmed with the situation of having her newborn child taken from her. After she left the shelter, she moved in with a friend but did not provide the address of her new residence to OCY. Mother denied that she told Ms. Szewczyk that she wanted to give up her parental rights to Child. When she called Ms. Szewczyk

on November 22, 2024, Mother informed Ms. Szewczyk that she was not doing well. She further told Ms. Szewczyk that she loves Child and wants to work towards reuniting with Child but she felt overwhelmed by the situation at the time. Mother acknowledged that after she left The Refuge, she stopped complying with the treatment plan entirely. When asked why she stopped complying, Mother stated:

> [I] feel some type of way that I have to get my children taken out of my care due to me having a mental health maybe issue or have a drug little addiction, and I couldn't take care – you feel like I couldn't take care of my child just because I – and even if I did ask for help, that means that if you guys are supposed to be in a person's life to be there to help the child and the mother, then that's what y'all supposed to do, not bash them and down us. Simple as that.

(N.T. Termination Hearing, 4/10/25, at 129). Mother further acknowledged that she knew that she needed to comply with the treatment plan to be reunited with Child. Mother denied that Ms. Szewczyk discussed the treatment plan with Mother when Mother contacted her. When asked why Mother did not ask Ms. Szewczyk about reengaging in services to comply with her treatment plan, Mother stated that she believed she "could do it on [her] own." (*Id.* at 125). Mother was also aware that OCY was seeking to change the goal to adoption at the permanency review hearing on January 27, 2025. Nevertheless, Mother did not appear at that hearing because she was emotionally overwhelmed at the thought of the proceedings.

Mother did not engage in any further services until after the involuntary termination petition was filed on March 28, 2025. Since then, Mother has

initiated mental health services at Women's Behavioral Health. She is in therapy and is about to start on medication. At the time of the termination hearing, Mother was still staying with her friend. Mother was seeking a longer-term housing option but stated that housing options were limited. Mother did not have a job or any other source of income. She stated that she was seeking employment. Mother testified that she made a mistake when she was emotionally overwhelmed and stopped complying with the treatment plan. Mother stated that if the court gave her more time, she was willing to reengage in services to progress with her treatment plan. When asked if she was ready to comply with everything OCY wanted her to do, Mother responded, "I have no choice." (*Id.* at 127).

Mother further testified that she complied fully with the treatment plan in R.A.B.'s case and R.A.B. was returned to her care. Mother acknowledged that after R.A.B. was returned to her care, Mother became overwhelmed and failed to maintain her sobriety. This resulted in R.A.B. being removed from Mother's care again and the involuntary termination of Mother's parental rights to R.A.B.

Child's attorney opined that there would be no detriment to Child by terminating Mother's parental rights to Child. Child's counsel noted that Mother has not made any meaningful progress towards demonstrating that she can parent Child. Child needs stability and continuity. As such, Child's best interests are served by terminating Mother's parental rights and maintaining his current placement with Maternal Aunt, with whom Child is well

bonded.

On April 14, 2025, the court involuntarily terminated Mother's parental rights to Child.[2]  On May 13, 2025, Mother filed a timely notice of appeal and a contemporaneous concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).

Mother raises the following issues for our review:

> Whether the [Orphans' Court] erred in terminating [Mother's] parental rights pursuant to 23 Pa.C.S. § 2511(a)(2) where the record fails to support a finding that [Mother] cannot or will not remedy any incapacity.
>
> Whether the [Orphans' Court] erred in determining that termination of parental rights best served the developmental, physical, and emotional needs and welfare of the child under 23 Pa.C.S. § 2511(b).

(Mother's Brief at 6).

In her issues combined, Mother contends that OCY did not afford Mother a reasonable period of time to engage in reunification services and work on her treatment plan before filing a petition to involuntarily terminate her parental rights to Child.  Mother asserts that she was fully compliant with her treatment plan for a period of time after Child was adjudicated dependent. Mother claims that she was overwhelmed by the emotional trauma of having her newborn removed from her care and disclosed her struggles to Ms.

---

[2] The court also involuntarily terminated Father's parental rights to Child in the same proceeding.  Father has filed a separate appeal, docketed in this Court at No. 593 WDA 2025.

Szewczyk. Mother argues that Ms. Szewczyk did not adequately provide Mother with support and assistance during this time even though Mother continued to stay in contact with her. Mother claims that she was transparent about her mental health and substance abuse struggles, sought assistance and expressed a genuine intention to re-engage in services to work towards reunification. As such, Mother contends that the court erred in finding that Mother's incapacity to parent Child cannot or will not be remedied as to warrant termination of her parental rights. Additionally, Mother asserts that she attended three visits with Child where she had positive interactions with Child. Mother argues that there was no evidence presented that Mother did not have a meaningful connection with Child or that continued contact between Mother and Child would be harmful to Child. Mother concludes that the court erred in finding that involuntary termination of her parental rights to Child was proper pursuant to Sections 2511(a)(2) and (b). We disagree.

Appellate review in termination of parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972 A.2d 5, 8 (Pa.Super. 2009)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's

decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).

Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

*In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. *In re R.L.T.M.*, 860 A.2d 190, 191[-92] (Pa.Super. 2004).

*In re Z.P., supra* at 1115-16 (quoting *In re Adoption of K.J.*, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

The Orphans' Court granted involuntary termination of Mother's parental rights to Child on the following grounds:

**§ 2511. Grounds for involuntary termination**

- 11 -

**(a)  General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*  \*  \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*  \*  \*

**(b)  Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), and (b).  "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." ***In re Z.P., supra*** at 1117.  When conducting a termination analysis:

Initially, the focus is on the conduct of the parent.  The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a).  Only if the court determines that the parent's conduct warrants termination of…his parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under

the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties. *In re Z.P., supra* at 1117. "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *Id.* at 1117-18. Under Section 2511(a)(2), "the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In Interest of Lilley*, 719 A.2d 327, 330 (Pa.Super. 1998).

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *Id.* Significantly:

> In this context, the court must take into account whether a bond exists between child and parent, and whether

- 13 -

termination would destroy an existing, necessary and beneficial relationship.

When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Z.P., supra* at 1121 (internal citations omitted).

Further, our Supreme Court has clarified that, in making a Section 2511(b) determination, a trial court must analyze: (1) whether the parental bond is "necessary and beneficial to the child;" (2) "the child's need for permanency and length of time in foster care;" (3) "whether the child is in a pre-adoptive home and bonded with foster parents;" and (4) "whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety and stability." *Interest of K.T.*, ___ Pa. ___, ___, 296 A.3d 1085, 1113 (2023). Moreover, the Court explained that, when reviewing the nature of the parental bond, a court must consider "whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *Id.* Importantly, the *K.T.* Court's decision is particularly relevant to an analysis of an existing parental-bond. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

J-A26039-25

Instantly, the court explained that termination of Mother's parental rights was appropriate under Section 2511(a)(2), stating:

Though Mother showed initial compliance with the treatment plan, her relapse in November nullified any progress she may have made while repeating the unfortunate cycle of substance abuse that led to the termination of her rights to R.A.B. Mother never showed consistent or stable housing during the dependency case, leaving The Refuge and moving in with a friend while not giving any forwarding address information to OCY. Mother continues to insist that she and Father are an intact couple…. This is concerning … due to the domestic violence and codependency issues Father brings into her life….

Mother did not engage in services ordered by the [c]ourt until the filing of the petition and insisted that she could bring stability to her life by her own doing, did not take significant steps to remedy her mental health issues, and only superficially engaged in the parenting program. Further, Mother paradoxically showed a contempt for OCY staff and counsel who were attempting to assist her and a chronic sense of being overwhelmed whenever her infant children were in her care. To conclude, Mother's inability to acknowledge the significant problems she faces establish her incapacity to suitably raise Child. The [c]ourt finds that it is unlikely the conditions and causes of Mother's incapacity will be remedied by Mother due to these significant and numerous issues causing significant instability with respect to Child.

(Orphans' Court Opinion, filed 6/3/25, at 13-14).

The record supports the court's conclusions. *See In re Z.P., supra*. Mother entirely failed to comply with her treatment plan from when she left The Refuge in November of 2024 until the involuntary termination petition was filed. The court credited Ms. Szewczyk's testimony that this was consistent with Mother's established pattern since 2010 of short periods of sobriety with

- 15 -

repeated relapses. Additionally, the record belies Mother's claim that Ms. Szewczyk did not provide adequate support when Mother reached out to her after she left The Refuge. Ms. Szewczyk testified that she informed Mother of the need to be compliant with her treatment plan, urged Mother to get in contact with her service providers, and repeatedly sent Mother the contact information for those providers. On this record, we discern no abuse of discretion in the court's conclusion that termination of Mother's parental rights to Child was warranted under Section 2511(a)(2). *See In re Z.P., supra*; *In Interest of Lilley, supra*.

Regarding Section 2511(b), Mother has only had three visits with Child and these visits occurred before November 19, 2024. Mother has not seen Child since then and has not contributed to Child's developmental, physical and emotional needs and welfare in any meaningful way. Ms. Szewczyk, Mr. Vicander, and Child's attorney opined that Child would not suffer any detriment if Mother's parental rights to Child were involuntarily terminated. Additionally, Child is doing well in Maternal Aunt's care, who is an adoptive resource and is also caring for Child's siblings. Ms. Szewczyk and Mr. Vicander testified that Maternal Aunt provides for all of Child's needs and Child is well bonded to Maternal Aunt. On this record, we discern no abuse of discretion in the court's determination to terminate Mother's parental rights to Child. *See In re Z.P., supra*; *In re K.Z.S., supra*. Accordingly, we affirm.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 12/10/2025